IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
JUANITA BADILLO,                 :         CIVIL ACTION
          Plaintiff             :
                                :
     VS.                         :
                                :
JO ANNE B. BARNHART,             :
Commissioner of Social Security,:
          Defendant             :         NO. 06-1988
```

## REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Juanita Badillo, brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's claim for disability insurance benefits (DIB) under Titles II of the Social Security Act (Act).  The parties have filed cross-motions for summary judgment.  For the reasons which follow, it is recommended that summary judgment be granted in favor of the Commissioner.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a fifty-two (52) year-old female born on February 8, 1954 (Tr. 97).  She has a high school education, and past work experience as a machine operator and laborer (Tr. 131).  Disability

is alleged as of October 15, 2001[1], due to back, shoulder, and leg pain, and arm numbness (Tr. 52).

Plaintiff's application was denied initially (Tr. 97-99), and she then requested a hearing before an Administrative Law Judge (ALJ).  A hearing was commenced on January 6, 2005, at which, plaintiff, represented by counsel, testified, along with a vocational expert (VE) (Tr. 24-67).  In a decision rendered March 14, 2005, the ALJ determined that the plaintiff has an "impairment or combination of impairments considered severe" which prevent her from performing her past work.  The ALJ further determined that the plaintiff retains the residual functional capacity to perform limited light work.  Plaintiff was, thus, found not to be entitled to benefits (Tr. 16-23).

The ALJ's findings became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on March 9, 2006 (Tr. 5-7).  Presently, plaintiff has appealed that decision to this court.


## JUDICIAL REVIEW

The role of this court, on judicial review, is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552

---

[1]Plaintiff amended her disability onset date to December 15, 2003 at the administrative hearing (Tr. 33).

(1988).  "Substantial evidence" is not "a large or significant amount of evidence but rather such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Id</u>. at 664-65.  "The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999).

To establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." <u>Stunkard v. Secretary of Health and Human Services</u>, 841 F.2d 57 (3d Cir. 1988), <u>quoting</u> <u>Kangas v. Bowen</u>, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423(d)(1) (1982).  A claimant can establish such a disability in either of two (2) ways: (1) by producing medical evidence that one is disabled <u>per se</u> as a result of meeting or equaling certain listed impairments set forth in 20 C.F.R. Regulations No. 4, Subpart P, Appendix 1 (1987); <u>see</u> <u>Heckler v. Campbell</u>, 461 U.S. 458 (1987); <u>Stunkard v. Secretary of Health and Human Services</u>, 841 F.2d at 59; <u>Kangas v. Bowen</u>, 823 F.2d at 777; or (2) by demonstrating an impairment of such severity as to be unable to engage in "any kind of substantial gainful work which exists in the national economy." <u>Heckler v. Campbell</u>, 461 U.S. at 461; 42 U.S.C. § 423(d)(2)(A).

This method of proving disability requires that the claimant

3

first show that he/she is unable to return to his/her former work due to a physical or mental impairment.  Once a claimant has demonstrated that he/she is unable to perform his/her former work, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he/she is able to perform, taking into consideration the claimant's physical ability, age, education and work experience.  See Kangas v. Bowen, supra; Rossi v Califano, 602 F.2d 55, 57 (3d Cir. 1979); 42 U.S.C. § 423(d)(2)(A).

This case was decided under the medical-vocational regulations which require a five-step sequential evaluation of disability claims.  See generally, Heckler v. Campbell, supra; Santise v. Schweiker, 676 F.2d 925 (3d Cir. 1982).  The sequential evaluation considers in turn current work activity, the severity of impairments, the ability to perform past work and vocational factors.  20 C.F.R. §§ 404.1520 and 416.920.

In this case, the Commissioner reached the fifth step of the evaluation and determined that plaintiff was capable of performing limited light work.

## MEDICAL HISTORY

The relevant evidence in this case consists of medical reports and testimony which are summarized as follows:

An MRI of plaintiff's cervical spine was performed on January

4

7, 2002.  Dr. Richard Chesnick gave his impression as "bulging of the disc with right greater than left neural foraminal degenerative narrowing at the C5-6 level, spondylitic ridging to a small degree at the C5-6 level, [and] small focal central herniation at the C4-5 level" (Tr. 279-280).

Plaintiff had an MRI of her lumbar spine performed on January 31, 2001.  Dr. Chesnick reported "minor bulging of the annulus at the L2-3 level, broad-based herniation at the L4-5 level which is slightly more notable to the left of the midline, [and] bulging of the annulus and spondylitic ridging is present as well" (Tr. 169).

On November 7, 2001, an MRI was performed on plaintiff's right shoulder.  Dr. Chesnick's impression was a [V]ery small localized partial thickness abnormality of the supraspinatus tendon which is nonspecific but could reflect some tendinitis, degeneration, or very small intrasubstance partial thickness tear, [and] no evidence of full thickness tear, bursitis, or occult fracture" (Tr. 281).

On February 7, 2002, plaintiff was seen for a consultation at the Reading Neck and Spine Center.  Dr. David Abraham reported that x-rays demonstrated normal cervical alignment, and a cervical MRI revealed a "very small amount of spondylosis[2] at C5-5 and C6-7 with mild uncinate narrowing" (Tr. 198-199).

---

[2]Spondylolysis- dissolution of a vertebra; a condition marked by platyspondylia, aplasia, of the vertebral arch, and separation of the pars interarticularis.  Dorland's Illustrated Medical Dictionary, Twenty-ninth Edition, 2000, p. 1684.

Plaintiff was evaluated and given electrodiagnostic testing by Dr. Beverly Pattillo on February 12, 2002.  Dr. Pattillo reported that "NCS/EMG testing in the patient's right upper extremity is not revealing any peripheral nerve abnormalities [and] EMG testing in the patient's right upper extremity and right cervical paraspinal muscles are compatible with acute changes about the C5-C6 level suggestive of a C5-C6 radiculopathy"[3] (Tr. 282-284).

On March 27, 2002, plaintiff had a neurologic consultation with Craig Johnson, M.D.  Plaintiff complained of right shoulder pain, right arm pain, and paraesthesias from a work accident in October 2001.  Neurological examination showed "excellent strength and tone in all major muscle groups of both upper extremities and both lower extremities.  No atrophy.  No fasciculation.  Strength is 5/5 throughout."  Dr. Johnson concluded that plaintiff has an intrinsic dysfunction of the right shoulder and may possibly also have a right cervical radiculopathy.  He added that a "myelogram and a CT myelogram seem to demonstrate some abnormality involving nerve root sleeve filling at C6-7 on the right side related to foramina narrowing" (Tr. 174-178).

Plaintiff was also being seen at this time by Stephen Softer, M.D.  On May 14, 2002, Dr. Softer indicated that plaintiff had been seen by Dr. Abraham and that Dr. Abraham believed plaintiff's problem to be more in her shoulder than spine, and that he did not

---

[3] Radiculopathy- disease of the nerve roots.  <u>Dorland's</u> at 1511.

believe the amount of nerve compression present to be severe.  Dr. Softer added that plaintiff also received an injection in her shoulder, but the majority of her pain was not relieved and she continued to complain of numbness and tingling in the index, long, and ring fingers (Tr. 203).

Plaintiff saw Dr. Softer several more times in 2002.  On July 9, 2002, Dr. Softer reported that plaintiff continued to complain of shoulder pain.  He was not certain that surgery would resolve her pain, and noted that she had been terminated at her job (Tr. 200-201).

Dr. Gerald Williams examined plaintiff on September 23, 2002.  He stated that plaintiff's MRI scan demonstrated a "small amount of fluid in the subacromial space.  Otherwise, there is no pathology seen within the shoulder joint."  Dr. Williams concluded that plaintiff's "symptoms may be compatible with minor rotator cuff tendinitis, but we would not be able to subscribe all of her symptoms to this etiology."  Conservative treatment was continued (Tr. 277-278).

On October 23, 2003, plaintiff had x-rays taken of her lumbosacral spine.  Dr. Jonathan Stolz reported "minor arthritic changes" (Tr. 220).

Plaintiff was examined by Paul Maranzini, D.O., on October 30, 2003 at the request of the Pennsylvania Bureau of Disability Determination.  Dr. Maranzini indicated that plaintiff's recent

7

lumbosacral spine x-rays showed "minor arthritic changes seen with some ossified formation and a slight scoliotic curve is identified, but the intravertebral disc spaces are well preserved.  There is no evidence of spondylolisthesis.[4]  Spondylolysis cannot be excluded. Spina bifida deformity of the sacrum is seen.  Clips are identified in the right quadrant from previous surgery.  Basically, the lumbar spine impression was minor arthritic changes" (Tr. 221-222).

Dr. Maranzini reported further that examination of the shoulder, arm, and hand demonstrated that the plaintiff has full range of motion.  Plaintiff's hip, knee, and ankle were negative for any abnormality.  They have full range of motion in all planes of movement.  Examination of the back indicated that plaintiff had complaints of pain on full extend of range of motion of the thoracolumbosacral spine.  Dr. Maranzini added that her "emotional status was normal.  After completion of a range  of motion chart and a review of the medical record, Dr. Maranzini completed a work-related physical activities' chart.  He opined that plaintiff can lift on a "frequent basis 2 to 3 pounds, 10 pounds, and up to 20 pounds.  Carrying: occasionally, she can carry 20 pounds.  Capacity in carrying, she can carry up to 10 pounds.  She can carry on an occasional basis at 20 pounds, with both arms, up to 25 pounds.

---

[4]Spondylolisthesis- forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis. Dorland's at 1684.

Standing and walking: no limitation.  Sitting: no limitation." He
further found no limitation with the right and left shoulder (Tr.
224-230).

Plaintiff was given a psychiatric evaluation on February 24,
2004 by Dr. Hoda Hanna.  Plaintiff reported to Dr. Hanna that she
began hearing voices on January 23, 2004 telling her to kill
herself and that she would end up crying and getting angry.  Dr.
Hanna indicated that "[C]ognitively [plaintiff] seemed intact and
oriented to all 3 spheres.  Patient seems to be having problems
dealing with the loss of her nephew which has triggered issues
about the loss of her mother 30 years ago, which caused a lot of
flashbacks, anxiety and nightmares."  Dr. Hanna diagnosed her with
major depressive disorder with psychotic features, single episode,
anxiety disorder, and post-traumatic stress disorder."  Dr. Hanna
recommended therapy and medication (Tr. 292-293).

On December 21, 2004, less than three weeks before the
administrative hearing in this case, plaintiff was given a
psychiatric evaluation at the New Direction Treatment Services.
Plaintiff's chief complaint was depression and anxiety.  It was
reported that her attitude was cooperative, eye contact fair and
normal, thought process goal-directed, intelligence average, affect
depressed, and insight and judgement poor.  She was also found to
have no psychosis and mania, and her cognitive status was oriented.
It was recommended that she return to the clinic in three weeks for

treatment of depression and anxiety (Tr. 365-370).

Dr. Victoria Stella completed a Cervical and Lumbar Spine Medical Source Statement of Functional Abilities and Limitations on January 12, 2005 that was requested by plaintiff's attorney. Dr. Stella diagnosed plaintiff with right shoulder impingement syndrome, irritable bowel syndrome, and depression. She opined that plaintiff is able to lift less than 10 pounds occasionally, and capable of using her right dominant hand to grasp, twist, and turn only 10% of an 8-hour workday. In support of her opinion, Dr. Stella cited findings of a cervical myelogram which showed a mass at C5-6, and decreased range of motion of the right shoulder (Tr. 373-377).

A vocational expert (VE) testified at the administrative hearing. The ALJ asked the VE to assume an individual who was able to lift ten pounds occasionally, sit for six hours in a workday, and stand/walk for six hours in this time. The ALJ then asked the VE whether an individual with these limitations would be able to perform most of the occupations at the light exertional level. The VE responded, "Yeah, I think it would technically eliminate all light work"(Tr. 50). The VE then went on to expand his testimony identifying light work jobs that this person was capable of doing. The ALJ asked the VE whether such an individual could perform the occupation of hostess at the light exertional level. The VE responded that such a person could perform this job, and could also

perform the occupation of ticket taker at the light exertional
level (Tr. 50-51).

## DISCUSSION

The Commissioner's findings must be affirmed if they are
supported by substantial evidence.  42 U.S.C. § 405(g); Richardson
v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  The
role of this court is to determine whether there is substantial
evidence to support the Commissioner's decision.  Williams v.
Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507
U.S. 924, 113 S. Ct. 1294 (1993).

In coming to a decision, it is the ALJ's responsibility to
resolve conflicts in the evidence and to determine credibility and
the relative weights to be given to the evidence.  Richardson v.
Perales, supra.

In this case, the ALJ found that the medical evidence
establishes that plaintiff has an "impairment or combinations of
impairments considered severe" that prevent her from performing her
past work.  The ALJ, however, further determined that she retains
the following residual functional capacity: "lift/carry 2-3 pounds
frequently and 10 pounds occasionally; stand and/or walk for at
least 6 hours; sit for at least 6 hours; and no repetitive hand
use.  The claimant retains the mental capacity to perform the
mental demands of competitive unskilled work, which includes the
ability to understand, carry out and remember simple instructions;

respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting." She was, thus, found not to be entitled to benefits under the Act for this period (Tr. 22-23). After a review of the record, this court finds that the ALJ's decision is supported by substantial evidence and summary judgment should be granted in favor of the Commissioner.

Plaintiff first asserts in her Motion for Summary Judgment that the ALJ erred by rejecting key portions of her treating physician, Dr. Victoria Stella's opinion. Specifically, plaintiff argues that the ALJ's analysis of Dr. Stella's statement is flawed in that Dr. Stella opined that plaintiff is only capable of lifting less than 10 pounds occasionally, and can never lift 10 pounds or more, whereas the ALJ determined that plaintiff can lift 2-3 pounds frequently and 10 pounds occasionally. In his decision, the ALJ determined that the "medical evidence does not show significant or persistent complaints, objective findings or degree of treatment to support [Dr. Stella's] limitations. Accordingly, this opinion was not accepted in its entirety" (Tr. 20). We agree.

"Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.

1999) (citing <u>Rocco v. Heckler</u>, 826 F.2d 1348, 1350 (3d Cir.1987).[5]
However, a treating physician's opinion is given controlling weight
only when it is well-supported and consistent with the other
evidence on record.  20 C.F.R. § 416.927 (d)(2) (2001).  Where
supporting explanations are lacking, an ALJ may assign diminished
weight to even competent medical opinions.  <u>Plummer v. Apfel</u>, 186
F.3d 422, 429 (3d Cir. 1999).

Here, Dr. Stella's assessment of plaintiff's limitations is
inconsistent with the objective medical testing in the record, and
is also not supported by evidence from the other physicians of
record who examined and evaluated her.

Cervical x-rays performed in January 2002, showed a normal
cervical alignment, and an MRI revealed only a "very small amount
of spondylosis at C5-6 and C6-7 with mild narrowing" (Tr. 279-280,
198-199).  An MRI of the lumbar spine also performed in January
2001 revealed only "minor bulging of the annulus at the L2-3 level"
(Tr. 169).  In November 2001, plaintiff had an MRI performed on his
right shoulder.  Dr. Richard Chesnick gave his impression as a
"[V]ery small localized partial thickness abnormality of the
supraspinatus tendon which is nonspecific but could reflect some

---

[5]20 C.F.R. § 416.927 (d)(2) provides in part that ". . .[I]f we
find that a treating source's opinion on the issue(s) of the
nature and severity of your impairment(s) is well-supported by
medically acceptable clinical and diagnostic techniques and is
not inconsistent with the other substantial evidence in your case
record, we will give it controlling weight. . ."

tendinitis, degeneration, or a very small intrasubstance partial thickness tear, [and] no evidence of full thickness tear, bursitis, or occult fracture" (Tr. 281).

In March 2002, plaintiff was seen for a neurological consultation with Dr. Craig Johnson.  Dr. Johnson reported that neurological examination revealed "excellent strength and tone in all major muscle groups of both upper extremities and both lower extremities.  No atrophy.  No fasciculation.  Strength is 5/5 throughout" (Tr. 174-178).

Plaintiff received another MRI of the shoulder in September 2002.  Dr. Gerald Williams reported minimal findings stating that the scan showed a "small amount of fluid in the subacromial space.  Otherwise, there is no pathology seen in the shoulder joint."  He concluded that plaintiff's symptoms may be compatible with only "minor rotator cuff tendinitis," and conservative treatment was continued (277-278).

A year later in October 2003, Dr. Jonathan Stolz reported that lumbosacral x-rays revealed only "minor arthritic changes" (Tr. 220).  Also this month, plaintiff was examined by Dr. Paul Maranzini at the request of Social Security.  Dr. Maranzini reviewed plaintiff's lumbosacral x-rays and opined that they showed only "minor arthritic changes" (Tr. 221-222).  Dr. Maranzini further reported that examination of the shoulder, arm, and hand demonstrated full range of motion.  He also filled out a work-

14

related physical activities' chart, and opined that plaintiff is able to lift up to 20 pounds, carry up to 20 pounds occasionally, and stand, walk, and sit with no limitations. Dr. Maranzini also found no limitation with plaintiff's right and left shoulders (Tr. 224-230). Accordingly, since the above-discussed evidence does not support Dr. Stella's assessment, the ALJ gave her Statement of Functional Abilities its appropriate weight.

Plaintiff next argues that the ALJ committed reversible error by relying upon an incomplete hypothetical question. Specifically, plaintiff claims that the ALJ failed to properly include the limitations set forth by Dr. Stella in his hypothetical question. An ALJ's hypothetical questions to a VE must include all the limitations supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Here, the ALJ's hypothetical expressly limited plaintiff to being able to lift ten pounds occasionally, and sit, stand, and walk six hours in an eight-hour workday (Tr. 50-51). As discussed above, the evidence supports the ALJ's determination that plaintiff's conditions do not preclude her from performing the limited light jobs as identified by the ALJ. Thus, since the ALJ's hypothetical accurately reflected plaintiff's limitations that are supported by the evidence, this assertion is without merit.

Next, plaintiff contends that the ALJ erred in finding her "not disabled" under the grids. At step five of the sequential process,

15

the ALJ is required to consider whether a claimant's age, education, work history, and work-related limitations would allow a claimant to perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Accordingly, the grids were promulgated. 20 C.F.R. pt. 404, subpt. P, app. 2. The grids consider whether a particular combination of all four factors directs a conclusion of "disabled" or "not disabled," and only consider a claimant's ability to perform exertional demands. 20 C.F.R. § 404.1569a.

In this case, the ALJ determined that plaintiff was unable to occasionally lift twenty pounds, but was able to do all the other requirements of light work.[6] Thus, the ALJ found that the plaintiff had a residual functional capacity (RFC) between light work and sedentary work.[7]

Plaintiff claims that she would have been determined "disabled" by grid 201.12 had the ALJ properly applied Social Security Ruling 83-12.[8] This ruling concerns a situation where a

_____

[6]Light work requires a claimant to have the exertional abilities to lift no more than twenty pounds at a time, sit, and stand/walk for six hours in a workday. 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10.

[7]Sedentary work mandates a claimant to be able to occasionally lift ten pounds, sit for up to six hours in a workday, and stand/walk two hours in this time. 20 C.F.R. § 404.1567(a); Social Security Ruling 83-10.

[8]SSR 83-12 provides in relevant part:

  a. An exertional capacity that is only slightly reduced in

grid at a higher exertional level directs a finding of "not disabled," and the grid at the lower exertional level directs a finding of "disabled."   Plaintiff asserts that according to the VE's testimony, 90-95% of plaintiff's light occupational base was eliminated under the ALJ's hypothetical question, and that such a reduction represents a significant, and almost, complete erosion of the light occupational base.   Plaintiff argues that given Social Security Ruling 83-12:

> "There is no evidence that the remaining 10% of the light occupational base, by itself, would constitute a significant number of jobs, given that Ms. Badillo would be found disabled if she were limited to a full range of sedentary work. Instead, the evidence of record, particularly the VE's testimony, shows that Ms. Badillo's occupational base is so limited by the erosion of light jobs as to make a finding of disabled proper under Rule 201.12" (Brief in Support of Plaintiff's Motion for Summary Judgment at 15).

The Commissioner responds that plaintiff has misinterpreted this ruling.   We agree.   The Commissioner states that SSR 83-12 also provides that when two grids direct different conclusions, the ALJ should seek assistance from a VE[9], and that is exactly what the

-------

> terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."

> b.   On the other hand, if the exertional capacity is significantly reduced in terms of the regularity definition, it could indicate little more than the occupational base for the lower rule and could justify of "Disabled."

[9]SSR 83-12 also provides in relevant part:

> c. In situations where the rules [grids] would direct different conclusions, and the individual's exertional

ALJ did.  The VE testified that the plaintiff could perform the jobs of hostess and ticket taker at the light exertional level, and that such jobs exist in significant numbers in the national economy.  Thus, the ALJ complied with SSR 83-12 and determined that plaintiff was "not disabled" under the grids.

Plaintiff further argues that she could not perform a significant number of jobs in the national economy because the VE testified that she was unable to perform 90 to 95 percent of the occupations at the light exertional level.  The Commissioner asserts that to be found not disabled a claimant needs to only be able to perform one occupation that exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

Here, as mentioned above, the VE testified that plaintiff is able to do two jobs at the light level, hostess and ticket taker. He further testified that the occupations of ticket taker and hostess exist in significant numbers in the local and national economy.  The VE added that there were 400 jobs in the regional economy and 120,000 in the national economy (Tr. 51-52).  A number of federal courts including the Third Circuit have found significant numbers of jobs to exist in the local or regional

---

limitations are somewhat in the middle in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability.  Accordingly, VS [vocational specialist] assistance is advisable for these type of cases.

economy at lower levels than 200.  E.g., <u>Craigie v. Bowen</u>, 835 F.2d
56, 58 (3d Cir. 1987); <u>Allen v. Bowen</u>, 816 F.2d 600, 602 (11th Cir.
1987); <u>Welsh v. Barnhard</u>, 2003 WL 22466165; <u>Torres v. Shalala</u>, 1995
WL 321902.  Accordingly, we find that the ALJ properly relied on
the VE's testimony, and properly used the grids as a framework in
finding plaintiff not disabled.

Plaintiff next asserts that the ALJ elicited from the VE
testimony that was not his own, but was the ALJ's interpretation of
what jobs are available based on the ALJ's experience.  She further
argues that the ALJ improperly influenced the VE's testimony by, in
effect, telling the VE what to say.  Plaintiff sets forth several
examples of what she claims are improper statements that were said
by the ALJ at the hearing.  She asserts that the ALJ's initial
statement to the VE of "that's different [than] I get from a lot of
people, but its still work involved" (Tr. 51), shows that he would
not accept the answer given by his own witness.  His statement, "I
have of the three of them ticket taker, usher, and hostess,"
indicates that these are the ALJ's suggested jobs, not the VE's
testimony.  The ALJ also stated that "I'm looking for light [jobs]
because she is on a grid now" (Tr. 52).  Plaintiff contends that it
is clear from these statements that the ALJ was seeking to change
the VE's testimony in order to deny her claim.  Plaintiff also
lists several other comments from the ALJ in her motion such as,
"I'm not trying to put words in your mouth," that she asserts are

prejudicial.

We disagree.  Our reading of the VE's testimony indicates a very experienced ALJ who certainly asked well-informed and pointed questions to the VE, but whose questioning was not prejudicial to the plaintiff.  The social security regulations specifically provide that "[A]t the hearing the administrative law judge <u>looks fully</u> into the issues, <u>questions you and the other witnesses</u>, and accepts as evidence any documents that are material to the issues" (emphasis added).  There is nothing in this regulation that puts any limits on the questioning of the ALJ.  Moreover, plaintiff sets forth no case law or any other authority which regulates the questioning of an ALJ to a VE.  Accordingly, this claim is without merit.

Lastly, plaintiff argues that the ALJ erred by failing to fully and fairly develop the record with respect to her mental limitations.[10]  Specifically, plaintiff contends that the ALJ should have ordered a psychological consultative examination.[11]

---

[10]20 C.F.R. § 404.1527(c)(3) provides in part:

"If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence. . ."

[11]20 C.F.R. § 404.1517 states:

"If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you

As is apparent from the regulation, the duty to develop does not require a consultative examination.  In this matter, the ALJ was able to assess plaintiff's mental limitations without ordering a consultative examination.  In assessing plaintiff's mental residual functional capacity, the ALJ determined that the "claimant retains the mental capacity to perform the mental demands of competitive unskilled work, which includes the ability to understand, carry out and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting" (Tr. 22).

    The ALJ stated in his decision that:

> "The claimant's mental impairments are not associated
> with significant or persistent complaints, objective
> findings, or a degree of treatment consistent with
> disabling impairment.  She has not been hospitalized or
> followed through with therapy in any significant fashion.
> There is no indication of significant or persistent
> complaints in Dr. Stella's records and there have been no
> significant abnormalities on mental status examinations
> despite limited treatment" (Tr. 19).

A review of the medical evidence of record supports the ALJ's determination.  The record is really devoid of any mention of plaintiff's mental status until October 2003 when Dr. Maranzini noted that plaintiff's "emotional status was normal" (Tr. 223). Several months later in February 2004, plaintiff received a psychiatric evaluation by Dr. Hoda Hanna.  Plaintiff complained of

_____

to have one or more physical or mental examinations or
tests."

21

hearing voices.  Dr. Hanna reported that "[C]ognitively [plaintiff] seemed intact and oriented to all three spheres," and that she was having trouble with the loss of a nephew.  Dr. Hanna diagnosed plaintiff with major depressive disorder, with a "single episode" (Tr. 292-293).  In addition, there is no mention in her report that plaintiff does not have the mental ability to perform the jobs as described by the ALJ.

Plaintiff was also given another psychiatric evaluation in December 2004 for depression and anxiety, less than three weeks before the administrative hearing, at the New Direction Treatment Services.  Although, her affect and judgment were thought to be poor, her thought process was described as goal-directed and her cognitive status was oriented (Tr. 365-370).  In addition, this assessment, like her one conducted by Dr. Hanna, fails to indicate that plaintiff has a mental impairment that disables her from working.  It is not enough for the plaintiff to demonstrate the existence of an impairment.  It must be established that the impairment results in functional limitations so severe that it precludes the plaintiff from engaging in any substantial gainful activity.  Dupkunis v. Celebrezze, 323 F.2d 380 (3d Cir. 1963); Gardner v. Richardson, 383 F. Supp. 2 (E.D. Pa. 1974). Accordingly, the ALJ's assessment of plaintiff's mental capacity is supported by the record, and there was no need to order a

consultative examination.[12]

In conclusion, the ALJ considered and analyzed all the relevant medical evidence, and indicated both the evidence relied upon and his rationale in making his determination. <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Accordingly, the Commissioner's motion for summary judgment should be granted.

## RECOMMENDATION

**AND NOW**, this          day of                  , 2006,

**IT IS RESPECTFULLY RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and the Commissioner's Motion for Summary Judgment be **GRANTED.**

S/ Linda K Caracappa

_____

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

---

[12]In addition, as the Commissioner notes in her motion, plaintiff's attorney never requested a consultative hearing before, during, or after the administrative hearing. Plaintiff also has not suggested how a consultative examination would have changed the ALJ's decision.

23